IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HERMAN L. SMITH, on behalf of himself and all others similarly situated, | ) ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 10-678 |
| | ) | Judge Fischer |
| THE BANK OF NEW YORK MELLON CORPORATION, | ) ) | Magistrate Judge Mitchell |
| Defendant. | ) | |
| | ) | |

REPORT AND RECOMMENDATION

I.      Recommendation

It is respectfully recommended that the motion for summary judgment submitted on

behalf of Defendant, The Bank of New York Mellon Corporation (Docket No. 12), be denied.

II.      Report

Plaintiff, Herman L. Smith, brings this individual and class action under the Pennsylvania

Minimum Wage Act, 43 P.S. §§ 333.101-115 (PMWA), alleging that the Defendant, his former

employer, The Bank of New York Mellon Corporation ("BNY Mellon"), unlawfully failed to pay

him overtime wages.  Defendant argues that Plaintiff's job position of FXR Specialist satisfies

the PMWA's administrative exemption and thus he was not entitled to overtime wages.

Presently before this Court for disposition is a motion for summary judgment, brought by

the Defendant.  For the reasons that follow, the motion should be denied.

Facts

BNY Mellon is a leading bank holding and financial services company.  BNY Mellon's

focus is to help clients manage and transfer/move financial assets.  BNY Mellon is headquartered

at One Wall Street, New York, NY 10286. (Stanley Decl. ¶ 3.)[1] BNY Mellon is composed of various organizations and groups. Among these organizations are a large number of technology and information-services groups that work to maintain and support BNY Mellon's business infrastructure. (Id. ¶ 4.) One such group is the Technology Services Group ("TSG"). The TSG works to optimize BNY Mellon's information technology infrastructure to leverage the company's best practices, processes, and tools to deliver a highly competitive and efficient technology platform for the Company's customers and business partners. (Id.)

A small sub-group working within the TSG is the File Transmission Group (the "Group" or "FXR Group"). The FXR Group is located in Freeport, Pennsylvania. It is run by Thomas Hartos and his supervisor is Managing Director William Stanley. (Id. ¶¶ 2, 5; Hartos Decl. ¶ 2.[2]) The FXR Group's primary function is to arrange and carry out formal transfers of files between internal BNY Mellon business units ("internal clients") and external entities or the federal government ("external clients") over secure electronic databases. (Stanley Decl. ¶ 6; Hartos Decl. ¶ 3.) The Freeport, Pennsylvania FXR Group is the only corporate solutions file transfer group within BNY Mellon. As a result, the small Group services transfer requests by most − if not all − of the internal BNY Mellon business units. (Stanley Decl. ¶ 9; Hartos Decl. ¶¶ 4, 19.)

Typically, files are transferred by the FXR Group rather than through email attachment or in hard copy because the files at issue are too large and/or too confidential or otherwise sensitive in nature to transfer through traditional means. In most cases, the files being transferred contain

---

[1]    ECF No. 15 Tab 1.
[2]    ECF No. 15 Tab 2.

highly confidential financial information.  (Stanley Decl. ¶ 6.)  Many different kinds of files are transferred by the FXR Group including, but not limited to, financial reports, consumer account information, pension funds data, private wealth data, human resources data, and payroll data.  (Id. ¶ 9.)  The file formats transferred include Microsoft Excel documents, Microsoft Word documents, Microsoft Power-Point documents, and raw data.  (Hartos Decl. ¶ 13.)

The external clients to whom files are transferred include any entity with which BNY Mellon does business.  BNY Mellon also routinely makes file transfers with the federal government of materials such as treasury data.  (Stanley Decl. ¶ 6.)

Employees working in the FXR Group have the job title Software Systems Specialist ("FXR Specialist"). (Hartos Decl. ¶ 5.)  There are four levels of Software Systems Specialists — I to IV.  The rank corresponds to the Specialist's experience and skill level.  (Id. ¶ 6.)  The FXR Specialists in the Group perform the same basic tasks on a daily basis, regardless of their rank.  (Id. ¶ 10.)  The FXR Group is generally staffed with between six and eight FXR Specialists.  Each FXR Specialist is responsible for setting up and completing between twenty and thirty monthly file transfers of varying sizes and complexity.  (Id. ¶¶ 5, 47.)

On June 16, 1997, Herman Smith was hired by Mellon Bank N.A.  On January 1, 2008, after a merger between Mellon Financial Corporation and The Bank of New York which led to the formation of BNY Mellon, Smith became an employee of MBNA Pa. Institutional Services, LLC, a wholly-owned subsidiary of BNY Mellon. (Hartos Decl. Ex. I at 1.)  Before working at BNY Mellon, Smith was employed by PNC Bank in a variety of computer programming positions. (Hartos Decl. Ex. E.)

Smith's educational background includes a bachelor's degree from Duquesne University

in Philosophy, a Masters of Science in Information Sciences from the University of Pittsburgh School of Information Science, an Advanced Certificate in Accounting from Duquesne University, and a Masters of Arts in Liberal Studies from Duquesne University. (Hartos Decl. Ex. F.) In February 2003, Smith began working for the FXR Group as an FXR Specialist. He held this position until his voluntary resignation in January 2010. (Hartos Decl. ¶ 12 & Ex. D at 1.)

Procedural History

Plaintiff filed this action on May 18, 2010. Diversity jurisdiction is invoked pursuant to 28 U.S.C. § 1332 on the grounds that Plaintiff is a Pennsylvania resident, Defendant is an asset and securities services company with its corporate headquarters at One Wall Street, New York, New York, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00. (Compl. ¶¶ 4-6.) The complaint alleges that Plaintiff worked in excess of fifty hours each week, but was not compensated for his overtime hours, in violation of the PMWA. He also makes class action allegations on behalf of the approximately thirty other individuals holding the same position.

On August 16, 2010, Defendant filed a motion for summary judgment. It is noted that Defendant took this action after filing an answer to the complaint but prior to the Initial Local Rule 16.1 Scheduling Conference, which took place on September 3, 2010. At the conference, Plaintiff requested and received permission to conduct limited discovery in order to respond to Defendant's motion (ECF No. 19). Plaintiff filed his response to the motion on October 28, 2010, Defendant filed a reply brief on November 12, 2010 and Plaintiff requested leave to file a sur-reply brief, which he submitted on December 3, 2010.

<u>Summary Judgment</u>

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  <u>Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  <u>Anderson v. Liberty- Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Defendant argues that the FXR Specialist position falls under the administrative exemption of the PMWA.  Plaintiff contends that it does not and thus he is entitled to overtime wages.

<u>PMWA Exception for Bona Fide Administrative Employees</u>

The PMWA and its federal counterpart, the Fair Labor Standards Act ("FLSA"), establish a requirement that workers must be paid overtime wages for all hours worked over forty per week.  <u>See</u> 43 P.S. § 333.104(c); 29 U.S.C. § 207(a).  The protections of the PMWA and FLSA do not extend to everyone, however.  Both statutes contain exemptions for certain employees,

including very similar exemptions for employees who are employed in a "bona fide administrative capacity."  See 43 P.S. § 333.105(a)(5); 29 U.S.C. § 213(a)(1); Baum v. AstraZeneca L.P., 605 F. Supp. 2d 669, 675 (W.D. Pa. 2009), aff'd, 372 Fed. Appx. 246 (3d Cir.), cert. denied, 131 S.Ct. 332 (2010).

"Exemptions from the FLSA are to be narrowly construed against the employer, and the employer has the burden of establishing an exemption."  Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citation omitted).  Pennsylvania courts have looked to the FLSA for guidance in applying the PMWA.  See Commonwealth of Pa. Dep't of Labor & Indus., Bureau of Labor Law Compliance v. Stuber, 822 A.2d 870, 873 (Pa. Commw. 2003), aff'd mem., 859 A.2d 1253 (Pa. 2004).

A regulation implementing the PMWA exemption states that:

Employment in a bona fide administrative capacity means work by an individual:

(1) Whose primary duty consists of the performance of office or nonmanual work directly related to management policies or general operation of his employer or the customers of the employer.

(2) Who customarily and regularly exercises discretion and independent judgment.

…

(5) Who is paid for his services a salary of not less than $155 per week, exclusive of board, lodging, or other facilities, provided that an employee who is compensated on a salary or fee basis at a rate of not less than $250 per week, exclusive of board, lodging or other facilities and whose primary duty consists of the performance of work described in paragraph (1), which includes work requiring the exercise of discretion and independent judgment, shall be deemed to meet all of the requirements of this section.

34 Pa. Code § 231.83.  See also 29 C.F.R. § 541.200 (similar definition for "bona fide administrative capacity" under the FLSA).

Plaintiff concedes that he was paid more than $250.00 per week and that this part of the exemption is satisfied. (ECF No. 25 at 21 & n.1.) In 2008 and 2009, he earned an annual salary of $70,800.00 (or $1,475.00 per week), and in 2007 he earned $70,100.00 (or $1,462.42 per week). (ECF No. 24 ¶ 68.)[3]

However, he contends that he did not perform work "whose primary duty consists of the performance of office or non-manual work directly related to management policies or general operation of his employer or the customers of the employer" and that he did not perform "work requiring the exercise of discretion and independent judgment." These issues are vigorously debated by their parties in their submissions.

FXR Specialist Hiring Requirements and Knowledge

Defendant states that, to be hired, an applicant for an FXR Specialist position must have a minimum of 2 to 4 years of experience with the Company's organization technology practices, standards and procedures and have a solid understanding of the Company's overall software architecture and infrastructure components. The applicant must also have experience in selecting optimal testing environments and in coordinating with multiple parties. Further, it is essential that a potential FXR Specialist be experienced at addressing a variety of technical (hardware, software or application) problems, and be customer service oriented, with effective oral and written communication skills. An FXR Specialist also must be a problem solver who thinks creatively about solutions and adapts easily to changing priorities. (Hartos Decl. ¶ 7.)

---

[3]     Defendant cites to the last three years of Plaintiff's employment because courts have held that PMWA claims should be brought within the three-year statute of limitations contained in Pennsylvania's Wage Payment and Collection Law, 43 P.S. § 260.9a(g). See Caucci v. Prison Health Servs., Inc., 153 F. Supp. 2d 605, 610 (E.D. Pa. 2001).

In response, Plaintiff states as follows in his affidavit:

You do not need to have 2-4 years experience with the Company's organization technology practices, standards and procedures, or have a solid or any other understanding of the Company's overall software architecture and infrastructure components in order to be hired as an FXR Specialist. In fact, the Company would hire people off the street who had no knowledge of the Company or its technology practices, sign them to a six-month or one-year contract, train them in-house and have them perform the job. I can remember at least three contractors being hired in these circumstances during my tenure.

The other employees (about six other FXR Specialists) and the contractors (three that were hired during my tenure) in most cases had little or no customer-service experience or skills.

Neither I nor the other FXR Specialists were required to be "creative." In fact, we were required to follow the procedures already in place in writing (issued by the FXR Group well before I started to work for the FXR Group) not only for determining which protocols were to be used, but also for how to get the secured data from the clients to the responsible Mellon Business Group. The protocols, together with the internal procedures, defined how we were to perform our jobs, and we were not permitted to deviate from these written guidelines (either the protocols or the internal procedures). If we had been "creative" in the sense of deviating from these protocols or procedures we would no doubt have been disciplined or terminated.

(Smith Aff. ¶¶ 7-9.)[4]

Defendant states that, to fulfill their job responsibilities and engage in informed discussions with clients, FXR Specialists must have a fundamental understanding of the following: computer operating systems such as UNIX/AIX, LINUX, and Mainframe; file transfer protocols such as Connect Direct, FTP/PGP, Applicability Statement 2 (or AS2), NMD, HTTPs, and INOVUS; scheduling systems that order transfer jobs such as Maestro and ESP; and security measures to maintain file confidentiality, such as encryption technology and SSL certificates. FXR Specialists are expected to not only have knowledge of these systems, but also to be able to

explain them to customers. (Hartos Decl. ¶¶ 8-9.) FXR Specialists are evaluated based on their

familiarity with and knowledge of the various computer operating systems, file transfer

protocols, scheduling systems, and security measures. (Id.; see also Hartos Decl. Ex. G, Smith

2002 Performance Management Exempt Form at 4 ("He is an accomplished technician who can

accomplish most any set task given appropriate time. He has developed a firm knowledge of our

connectivity options...").)

> In response, Plaintiff states as follows:
>
> FXR Specialists were not required to have a "fundamental understanding" of the
> laundry list of programs and protocols identified by Mellon. For example, I did
> not have an understanding of UNIX/AIX, or LINUX; neither did most of the other
> FXR Specialists. I also did not have an understanding of Applicability Statement
> 2, NMD, HTTPs or INOVUS; neither did most of the other FXR Specialists. I
> knew little if anything about scheduling systems such as Maestro or ESP; these
> were handled by other groups in Mellon. I also knew little if anything about
> encryption technology or SSL certificates. These were the responsibility of
> technical people in the FXR group, but not the FXR Specialists. Neither I nor the
> other FXR Specialists were expected to have knowledge of all of these systems,
> and certainly weren't required to explain these systems to the customers (either
> the internal Mellon clients or the outside clients).
>
> The FXR Specialists, including myself, were evaluated based on our familiarity
> with and knowledge of the systems and protocols we actually worked with, not the
> list of systems and protocols Mellon claims we were required to be proficient in. I
> and the other FXR Specialists were required to follow the protocols given to us by
> Mellon management, not actually perform functions in different technical
> systems. In fact, when there were questions about or tasks to be performed within
> particular systems, like AS2, I and the other FXR Specialists would refer the
> matter to the technical person in Mellon responsible for the AS2.

(Smith Aff. ¶¶ 10-11.)

<u>FXR Specialist Duties</u>

Defendant states that the file-transfer process is carried out in three broad phases: (1)

---

[4]        ECF No. 25 Ex. 1.

consultation and plan development; (2) testing; and (3) production. (Stanley Decl. ¶ 10.)

Usually, the same FXR Specialist performs each of the three phases, with the Specialist working

independently to carry out the relevant tasks. (Hartos Decl. ¶¶ 15, 39.)

> In response, Plaintiff states as follows:

> While the file-transfer process broadly speaking involves three phases, the FXR Specialists have nothing to do with the plan development. Rather, the Business Unit (for example, the Automated Clearing House at Mellon) develops the plan with the client. I and the other FXR Specialists are simply responsible for facilitating the transfer of funds in accordance with the plan.

> Again, I and the other FXR Specialists do not develop the plan. As for working independently, I and the other FXR Specialists are given assignments on a daily basis by management (in particular Thomas Hartos), are required to report on the status of these assignments daily, can only perform their functions in accordance with the written protocols, and must get guidance from management, and from other groups within Mellon, where there are any questions or concerns that I or the other FXR Specialists can not resolve by referring to the written protocols or procedures (developed and written by someone other than [me]).

(Smith Aff. ¶¶ 14-15.)

Defendant states that, through discussion and negotiation, FXR Specialists work

independently with internal and external clients to develop mutually-agreeable plans to transfer

files in light of all the demands and circumstances of each project. (Hartos Decl. ¶¶ 21-40.) FXR

Specialists do not simply follow the same file-transfer procedures over and over. Instead, they are

responsible for developing a plan to transfer files after detailed communications with internal and

external clients. Different protocols and procedures are used depending on the needs of the

particular project and/or the problems confronted. (Id. ¶ 17.) The start of the file-transfer process

is the placement of a request to make a transfer by an internal BNY Mellon business unit. (Id.

¶¶ 18-19.) Each request is assigned by the Director of the FXR Group to an individual FXR

Specialist. (Id. ¶ 20.)  Occasionally, due to the size and time constraints of a project, multiple

FXR Specialists are assigned to one request. Some requests are "high-priorities," and must be

completed within tight time constraints. (Id. ¶ 21.)  Within 48 hours of being assigned a request,

the FXR Specialist should review the request and make initial client contacts.  (Id. ¶ 22.)

The FXR Specialist discusses with the internal and external clients the details of the

project, including: file type, size, and how often the file(s) will be transferred (i.e., hourly,

daily, monthly, yearly, etc.). (Id. ¶ 23.)  FXR Specialists must engage in comprehensive

discussions with the internal and external clients because the nature of file-transfer engagements

vary widely. (Id. ¶¶ 24-26, 29.)  In some cases, transfers are functionally as simple as dropping

files into a virtual box. (Id.¶ 24.)

Other transfers are far more complex. For example, some clients may need to arrange for

"rapid fire" file transfers. These are file transfers that are sent to the FXR Specialist one after

another, so fast (for example, every two seconds) that the FXR Specialist needs to create staging

so that the files are not overlayed or deleted. In other cases, projects must be simultaneously sent

to two sites, requiring the transfer to be performed twice to reach both end points. (Id. ¶ 25.)

Because different companies have different operating systems, the FXR Specialist also

must discuss the best way to connect to the external clients' network systems. In many cases,

external clients have operating systems with different attributes than BNY Mellon's. It is the

FXR Specialist's job to fully understand both parties' operating environments so that he can

establish parameters to ensure that the data is correctly transferred. (Id. ¶ 28.)  After familiarizing

himself with the nature and demands of the project, the FXR Specialist creates the baseline

system for the file transfer. To do so, the FXR Specialist establishes directory space (or a

mailbox) unique to the engagement's clients. After creating this unique space, he generates a username and password. The location of the directory space and the username and password are shared with the external client, who can use this information to access the space and upload or download the files. (Id. ¶ 30.)

One area that often requires extensive negotiation between the FXR Specialist and the external client is the use of a protocol to facilitate the file's transfer. Protocols work behind the scenes during the uploading and/or downloading process by finding the file, moving it byte by byte from one system to another, and error checking the file before upload or download is complete. (Id. ¶¶ 31-33.) While all protocols preform the same fundamental function, external clients often prefer one over another. FXR Specialists negotiate with each external client to find the best protocol for the transfer at issue - one with which both parties are comfortable working. As a result, FXR Specialists must have an intimate knowledge of the available transfer protocols so that they can analyze and negotiate which is the most appropriate for an engagement. (Id. ¶¶ 32-33.) As a result of these discussions, the FXR Specialist develops a plan to transfer the files and communicates the plan to both parties. (Id. ¶¶ 32-34.)

In response, Plaintiff states as follows:

There is no "plan" developed for the transfer of files; rather, once I and the other FXR Specialists are given the plan by one of the Business Group at Mellon it is simply a matter of consulting with the client to determine what system compatibilities exist between Mellon and the client. Once these compatibilities are determined I and the other FXR Specialists can then determine from a list of available Mellon protocols which one is suitable for the transfer. Neither I nor the other FXR Specialists can exercise any independent judgment about which protocols can or should be used; it is strictly a matter of matching up the Mellon protocols with the particular client.

I and the other FXR Specialists follow the same file transfer procedures, from a

prescribed list of available protocols developed by the private market and approved for use by Mellon's Security Group (not the FXR Group), for each and every file transfer. The protocols had such names as Connect Direct (Sterling Company), VPN (Cisco Concentrators/Routers - a piece of hardware developed and maintained by Ciscso), FTP/PGP (McAfee), AS2 (Cyclone Corporation). While the specific protocols used for a given transfer may vary from another file transfer, they only vary to the extent one of the other approved protocols may be more appropriate for a given transfer. Determining which protocol is appropriate for a given transfer involves mostly sending a list of the protocols to the client and asking the client to indicate which protocols are compatible with the client's systems, then exchanging appropriate protocol information with one another to run a test of the transfer to make sure the protocols work for that transfer.

I and the other FXR Specialists normally did not discuss the file type, size or how often the transfers would occur. These details were already stipulated in the plan developed between the Mellon business group and the clients.

There is no variation in the protocols used for file-transfer engagements (as I noted above). To say there were comprehensive discussions is misleading, not only in terms of the protocols but also in terms of executing the transfers. Most of the transfers, and the discussions with the clients in agreeing on the protocols and testing the protocols for the transfers, required only a few minutes of actual discussion with the clients, particularly for existing clients. For many of the repeat customers it took me and the other FXR Specialists less than five minutes to confirm the communications would be the same as prior transfers.

I've never heard the term "rapid fire" file transfers, but assume this refers to stock trades. In terms of the discretion or independent judgment required of me or the other FXR Specialists, or the so-called complexity of our jobs, though, it didn't matter how many trades, or file transfers, occurred in a particular time-frame. Setting up the transfers would require additional time, but the process we followed was the same: determine what the compatibilities were between the client and Mellon and then implement the plan developed by the client and respective Mellon business unit. As for sending transfers to two sites simultaneously, this involved nothing more than essentially putting the second site on copy (similar to putting a second person on copy to an e-mail).

The only "parameters" I can recall establishing were certain fields of information required in Connect Direct transfers or if we did an FTP transfer to a client's server. In these situations I and the FXR Specialists would simply follow procedures established within the FXR Group (established before I started working for the FXR Group), which procedures would require entering data (e.g., file name, from and to, IP address) obtained from the client. Neither I nor the

other FXR Specialists had any discretion in deciding which procedures to follow, or which data in those procedures had to be provided by the client.

I have no idea what is meant by "the FXR Specialist creates the baseline system for the file transfer." Again, I and the other FXR Specialists performed our duties in accordance with established protocols and procedures and in consultation with the Mellon business units and the instructions of the clients. All the FXR Specialist had to do was give the client access to the Mellon's server (giving the client a mailbox), a task that normally took about 30 minutes and was essentially the same task regardless of the nature of the transfer or the client.

There is no negotiation between the FXR Specialist and the client regarding the use of protocols; there is simply a determination of compatible protocols between Mellon and the client from a list of approved protocols for use in the transfers. There may have been situations where there were multiple protocols that were compatible, but all that meant is that I and the other FXR Specialists would let the client decide which protocol to use.

Again, if there were more than one compatible protocol the client would make the decision which to use. I and the other FXR Specialists would simply explain the pros and cons of each, and the client would then decide. Neither I nor the other FXR Specialists had the authority to tell the client, or the Mellon business units, which protocol to use.

There were no "plans" per se to transfer the files. Once the client told me and the other FXR Specialists which protocol it wanted we would simply enter that information into the Status/Notes area of the Oracle data base (called On-Line FXR - the client/file management system maintained in the FXR Group) so that any of the FXR Specialists, or managers, could determine at any time the status of a particular transfer or client account. Neither I nor the FXR Specialists, therefore, had to "communicate" anything other than to make sure the updated information was in our internal system.

(Smith Aff. ¶¶ 16-25.)

Defendant states that, after a file-transfer plan is formulated, a directory space is established, and a transfer protocol is agreed to, the FXR Specialist tests the connectivity and security of the proposed transfer. (Stanley Decl. ¶ 10.) During connectivity testing, various dummy files are sent back and forth between the parties. (Hartos Decl. ¶¶ 34-35.) If parties can

connect to transfer files, the FXR Specialist next tests security. To do so, he sends encrypted

dummy files locked with security measures to the external client. (Id. ¶¶ 34-35.) If the files are

not transferred correctly or securely, the FXR Specialist must independently isolate the cause of

the problems and develop solutions. (Id. ¶ 40.) The testing phase is of critical importance

because if data is not transmitted properly, it can be misrouted or destroyed. (Id. ¶ 44.)

> In response, Plaintiff states as follows:

> Regarding testing, once the protocol was determined by the client the testing
> performed by me and the FXR Specialists consisted primarily of sending a
> dummy data test to the client, confirming receipt of the data test, and confirming
> the accurate transmission of the data. Part of this involves a security test, but
> neither I nor the other FXR Specialists did anything other than run the security
> tests approved by Mellon Security. If any problems occurred in the transmission,
> or in security, we would talk with the customer to determine what problem
> occurred, see if the problem could be resolved by referring to the section of the
> procedure for troubleshooting, and, if not, going to a Mellon network person or
> technical consultant for assistance. The point is that neither I nor the other FXR
> Specialists could, or would, "develop solutions" beyond what was already
> available in the existing procedure or that would be provided by technical experts.

(Smith Aff. ¶ 26.)

Defendant states that, if testing is successful, and the FXR Specialist is confident that the

transfer plan he established will function properly, the file-transfer process goes into the

production phase. (Hartos Decl. ¶ 36.) In the live production phase of the transfer, FXR

Specialists exercise judgment in coordinating the transfer's timing with the clients. FXR

Specialists must determine the most prudent time to transfer a file based on internal and external

demands such as filing deadlines, system outages, and other network demands. (Id. ¶ 36.) File

transfers can be outgoing or incoming. The primary difference between outgoing and incoming

file transfers is direction. The underlying procedures are largely the same. (Id. ¶¶ 16, 37-38.) In

the production phase for outgoing files, the FXR Specialist sends the files to the external client and verifies that the files were received without any issues. (Id.) For incoming files, the FXR Specialist receives the files from the external client, verifies that the files have been properly and accurately transferred, and then provides the files to the appropriate internal BNY Mellon entity. (Id.)

In response, Plaintiff states as follows:

I don't know what a "transfer plan" is. We never used such a term. The only thing I can think this term refers to is the decision made by the client about what transfer mechanism and protocols to use for the transfer of the client's data (either money or other secure data). As for the timing of the transfer, neither I nor the other FXR Specialists have anything to do with the timing of the transfer. That is a decision made by the Mellon Business Group and the client; we simply follow the instructions from the Business Group. Moreover, "system outage" and "network demands" have no relevance to anything I or the other FXR Specialists did. Mellon made a big point to its clients that the Mellon servers were up "24/7/365". As for the file transfers themselves, it was the Mellon application group (e.g., Automated Clearing House) that performed testing with the clients with real data, and for production (i.e., the actual transfer of either money or other secure data) it was the Mellon Business Group that monitored the transaction to be sure the data was transmitted properly and would only contact the FXR Specialists if there were some problem with the transmission. Finally, the FXR Specialists were not involved in verifying the transmission or sending the "file" (I presume this means the data transmitted) to the internal Mellon Business Group. This was done automatically by the protocol.

(Smith Aff. ¶ 27.)

<u>FXR Specialists' Continuing Duties</u>

Defendant states that the vast majority of the time spent in making a file transfer (approximately 80%) involves communicating with the parties to the engagement to understand the clients' goals and needs, and to develop and explain a plan of action. (Hartos Decl. ¶ 42; Hartos Decl. Ex. F, Smith Resume (noting as experience "[c]onsulting with both internal and

external customers to establish communications.").)  Even after a project is over, former external clients regularly call FXR Specialists with whom they have worked before to ask for troubleshooting or other assistance with the transferred files or the transfer mechanism. External clients also reach out to FXR Specialists for help with new transfers.  (Hartos Decl. ¶ 43.)

Throughout the planning, testing, and production phases, the FXR Specialist must maintain an open dialogue with the internal and external clients.  If there are any issues with the transfers or testing, the FXR Specialist must work cooperatively with the parties to evaluate the problem and develop steps to reach a solution to those issues. FXR Specialists are expected to consult and involve other departments with the issue-resolution process as they deem necessary. In some cases, the FXR Specialist must retransmit the files, or develop new protocols for the transfer.  (Hartos Decl. ¶¶ 40-41.)  As a result, communication, consultation, and customer service skills are of critical importance for an FXR Specialist. Indeed, communication skills are a key factor taken into account in the yearly evaluation of FXR Specialists.  (Id. ¶ 42; Hartos Decl. Ex. J, Smith 2008 Performance Management Exempt Form at 2; Hartos Decl. Ex. G, Smith 2002 Performance Management Exempt Form at 7 ("Herman has developed a good working knowledge of all Mellon file transfer systems and their options. He is extremely good at communicating these options with the customer..."); Hartos Decl. Ex. H, Smith 2003 Performance Management Exempt Form at 3 (reviewing Smith's customer-related contributions and noting that "Herman does an excellent job interfacing with the customer. There have been several situations where the customer has voiced their pleasure in working with Herman.").) Defendant indicates that, in his Employee Profile, Indeed, as Smith admits, as an FXR Specialist, he relied on the "[a]bility to provide customer satisfaction, regarding problem resolution and

assistance with software products." (Hartos Decl. Ex. D, Smith Employee Profile, at 2.)

In response, Plaintiff states as follows:

I spent about 50% of my time communicating (via phone or e-mail) with either the client or the responsible Mellon business group in the initial determination of protocols to be used for particular transactions. The remainder of my time was spent on testing and establishing the directory space for each client and each transaction. Again, these tasks - all of them - had to be performed in accordance with written protocols (from the vendors) and procedures developed by various technical and business groups at Mellon.

Neither I nor the other FXR Specialists "developed" new protocols for transfers. Rather, when one protocol didn't work we simply selected from the menu of available protocols and, at the direction of the client, picked the protocol that worked.

Ironic that Hartos would make these statements about communication and consultation when Hartos himself would regularly tell me and the other FXR Specialists that Hartos "didn't give a crap what the customer wanted, just tell them what we're doing and if they don't like it, too bad." Yes, communication was important, but it's not as if we had to be Pulitzer-winning newspaper writers or media executives. In fact, we didn't even have to have a college degree for the job.

This is simply misleading. The comments I made in my employee profile about "software products" concerned the work I was doing for Mellon on Y2K from 1997-2000. The comment had absolutely nothing to do with my job as an FXR Specialist

(Smith Aff. ¶¶ 28-31.)

The parties agree that breakdowns of this communication can lead to damaged Company relationships. (Hartos Decl. ¶ 45.) Defendant states that, in late 2008, Smith was assigned as the FXR Specialist for a file-transfer engagement between BNY Mellon and a BNY Mellon client. The transfer project was in support of a large, high-priority asset-servicing deal. Smith was not responsive to the internal and external clients' requests for a clear planning process for the data's delivery. As a result, Hartos was forced to assign an additional FXR Specialist to handle the

18

engagement. (Hartos Decl. ¶ 45; Hartos Decl. Ex. A, 11/13/2008 Martin Stack Email.) On the other hand, open communication between FXR Specialists and internal and external clients can lead to strong client satisfaction. Also in 2008, for example, Smith was assigned to a file-transfer engagement between BNY Mellon and an important BNY Mellon external client. After Smith established a transfer plan and the data was starting to be received by the external client, the form of data changed. Smith was notified of the change and "immediately looked into the problem and identified a possible correction. When this change didn't solve the problem, he included people from other departments into the resolution process." The problem was then expeditiously resolved and Smith was commended for his performance. (Hartos Decl. ¶ 46 & Ex. B, 11/13/2008 Jean Hart Letter.)  However, Plaintiff responds that further discovery is required for him to admit or deny these statements.  (ECF No. 24 ¶¶ 59-60.)

<u>Whether FXR Specialists Are Autonomous Professionals</u>

The parties agree that, since the FXR Group is the only corporate solutions file-transfer group with BNY Mellon, FXR Specialists are in high demand. (Hartos Decl. ¶ 47.)  If an FXR Specialist encounters a problem or needs additional assistance, he is able to ask his manager or other Group members for assistance. (<u>Id.</u> ¶ 15.)  FXR Specialists also regularly consult and advise each other regarding file transfer questions. (<u>Id.</u> ¶ 41.) Indeed, Smith claims to have been regularly approached by his co-workers for advice on how to complete and arrange file-transfer engagements. (Hartos Decl. Ex. J, Smith 2008 Performance Management Exempt Form at 3.)

Defendant states that each FXR Specialist is expected to carry out his projects in a largely independent, autonomous fashion with only general managerial oversight. (Hartos Decl. ¶ 15.) Since the FXR Group is "always under pressure from many areas," FXR Specialists are expected

to optimize their time to balance their competing client demands and engagements. (See Hartos Decl. Ex. B, 1/13/2008 Jean Hart Letter; Hartos Decl. Ex. H, Smith 2003 Performance Management Exempt Form (noting that he has "been more successful at managing file transfer requests.").) Indeed, in his own words, Smith's "skill set" as an FXR Specialist included the "[a]bility to manage multiple projects concurrently regarding software evaluation and recommendations, program enhancements and testing." (Hartos Decl. Ex. D, Smith Employee Profile at 1.)

In response, Plaintiff states as follows:

The comments I made about "managing multiple projects concurrently regarding software evaluation and recommendations, enhancements and testing" were comments I made about my work on Y2K from 1997 to 2000. I did not have to do these types of tasks as an FXR Specialist, nor did the other FXR Specialists. I did no software evaluation or program enhancements as an FXR Specialist, and the only testing was the testing of dummy data to make sure the protocols worked.

I and the other FXR Specialists were told every day (typically in the morning) and throughout the day by Thomas Hartos what projects to work on and how to prioritize our work. The only "independence" we had was in making sure the transfers were conducted in accordance with the written protocols and procedures and going to the resources within the company (like the technical groups responsible for the procedures or the Business Unit with responsibility for the client) for assistance in making sure the protocols worked. But Hartos would not leave us alone for more than an hour or two even when we were performing our tasks in accordance with these written protocols and procedures. Hartos micromanaged essentially every aspect of the work being done by me and the other FXR Specialists throughout each and every day. As for being a "professional" none of us was required to have a college degree, certifications (e.g., Microsoft Computer Engineer) or licenses, and none of us was required to write any software.

(Smith Aff. ¶¶ 32-33.)

Defendant objects to Plaintiff's affidavit and the assertions made in his submissions on several grounds. First, it contends that Plaintiff should not have submitted his own Statement of

Material Facts[5] that contains his denials of Defendant's statements. It is true that much of this

information was already contained in Plaintiff's Response to Defendant's Concise Statement of

Material Facts (ECF No. 24) and did not have to be repeated in Plaintiff's own Statement.

However, this duplication constitutes harmless error and provides no basis for rejecting

Plaintiff's version of the facts.

Second, Defendant contends that Plaintiff's affidavit is "self-serving." This argument is

irrelevant, as the issue is whether Plaintiff can testify from his personal knowledge as to the

information he presents. See Fed.R.Civ.P. 56(c)(4) ("An affidavit or declaration used to support

or oppose a motion must be made on personal knowledge, set out facts that would be admissible

in evidence, and show that the affiant or declarant is competent to testify on the matters stated.")

Defendant has not argued, much less demonstrated, that Plaintiff cannot do so.[6]

Defendant cites an observation made by Judge Ambrose that "self-serving affidavits are

_____

[5]      Plaintiff's Statement of Material Facts is contained within his "Response to Defendant's
Motion for Summary Judgment" (ECF No. 25 at 2-20). Although Defendant is technically
accurate that Plaintiff did not comply with the Court's Local Rules by submitting a separate
pleading containing his response to Defendant's Statement, LCvR 56(C), this minor error does
not mean that Plaintiff's facts should be rejected or that Defendant's facts should be deemed
admitted.

[6]      In a footnote, Defendant invokes the "rationale" of the sham affidavit doctrine, which
states that "a court will disregard an affidavit that is inconsistent with an affiant's prior
deposition testimony … unless the party relying on the affidavit in opposition to the motion can
present a legitimate reason for the discrepancies between the deposition and the affidavit." Smith
v. Johnson & Johnson, 593 F.3d 280, 285 n.3 (3d Cir. 2010). (ECF No. 26 at 9 n.4; ECF No. 28
at 23 n.6.) It uses the word "rationale" because it did not take Plaintiff's deposition and therefore
his affidavit cannot be inconsistent with his deposition. In other words, the doctrine does not
apply. Contrasting Plaintiff's statements with comments he made years before in performance
self-appraisals (documents not made under oath and not in connection with this litigation) may
raise questions as to Plaintiff's credibility, which is for the trier of fact to determine, but it does
not allow the Court to disregard the affidavit Plaintiff has submitted in this case. See Schaefer v.
Indiana Michigan Power Co., 358 F.3d 394, 400-01 (6th Cir. 2004).

typically entitled to little weight, and may be insufficient to raise genuine issues of material fact if they lack factual support in the rest of the record." Heasley v. EchoStar Satellite L.L.C., 2009 WL 1457733, at *1 (W.D. Pa. May 22, 2009). However, the case cited by Heasley to support this proposition, Dyszel v. Marks, 6 F.3d 116, 129 (3d Cir. 1993), was a diversity action in which the question was whether the plaintiff's injuries were "serious" within the meaning of a New Jersey statute that limited the right of non-residents to sue for non-economic loss by automatically assigning the so-called verbal threshold tort option solely on the basis of whether the insurance carrier was authorized to transact business in the State of New Jersey. The court concluded that the plaintiff's affidavit was insufficient to satisfy the statute's requirement that he submit "objective, credible evidence that could support a jury finding in his or her favor" rather than "subjective complaints of pain." This narrow holding in Dyszel had no application in Heasley and has no application here.

Plaintiff's affidavit does not have to cite "factual support in the rest of the record" because Plaintiff can testify as to what his job responsibilities were from his own personal knowledge. See Schaefer, 358 F.3d at 400-01 ("Neither the job description that Schaefer wrote for his resume nor Schaefer's failure to dispute [the employer's] position descriptions or performance evaluations prior to this lawsuit preclude him from arguing that his day-to-day activities differ from those described in these documents—such actions merely raise credibility questions for the factfinder."); Bothell v. Phase Metrics, Inc., 299 F.3d 1120, 1128 (9th Cir. 2002) (job description portrayed Bothell as managing employer's account and performing all of the administrative aspects of that task, but Bothell testified that he was essentially a highly skilled repairman who kept the equipment in good working order, and this issue of fact had to be

remanded to the district court for trial).

Defendant also points to the job description for the Software Specialist II position, which states as follows:

> Minimum 2 – 4 years experience required.  Job holder must have working knowledge of his company's organization's technology practices, standards and procedures and have a solid understanding of the overall software architecture and infrastructure components. S/he must have prior experience with producing detail-level functional requirement documentation and assisting with the selection of the optimal testing environment for specific applications. S/he must also be experienced with coordinating all parties affected by putting new applications into production.
>
> S/he must be experienced at addressing a variety of technical (hardware, software or application) problems. S/he must also be customer-service oriented and have effective oral and written communication skills.  Job holder must be an experienced problem solver who thinks creatively about solutions and adapts easily to changing priorities.  B.S. or B.A. or equivalent work experience required; certification beneficial.

(King Decl. ¶ 4 & Ex. 2.)[7]

However, Plaintiff points to an FLSA regulation providing that: "A job title alone is insufficient to establish the exempt status of an employee.  The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part."  29 C.F.R. § 541.2 (2004).  See Ale v. Tennessee Valley Auth., 269 F.3d 680, 689 (6th Cir. 2001) (affirming district court's decision to reject employer's proffer of plaintiffs' resumes and job descriptions based upon testimony in the case).  Moreover, as noted above, Plaintiff can testify based upon his personal knowledge that, in reality, he did not have to meet the "requirements" that appear on paper or in his job description and that he knew others who did not meet these requirements as well.  Defendant can

challenge Plaintiff's assertions, but at this stage of the proceedings, the record reflects the existence of genuine issues of material fact with respect to Plaintiff's job duties.

Primary Duty Test

The second part of the three-part test for the administrative exemption is referred to as the primary duty test, which requires that the employee's primary duty be to perform office or non-manual work directly related to management or general business operations of the employer. The employee "must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). Work directly related to management or general business operations includes work in functional areas such as finance, accounting, budgeting and computer network, internet and database administration. 29 C.F.R. § 541.201(b). "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's jobs as a whole." 29 C.F.R. § 541.700. The focus is on the evidence of the plaintiff's day-to-day duties, and not on job descriptions, resumes, or performance evaluations. See Schaefer, 358 F.3d at 400.

Defendant argues that Plaintiff's position consisted of arranging for and carrying out the formal transfers of files between BNY Mellon business units and external entities. It cites Heffelfinger v. Electronic Data Systems Corp., 580 F. Supp. 2d 933, 941-45, 962 (C.D. Cal. 2008), in which network and database administrators' duties included troubleshooting complex network design issues related to database architecture, formulating solutions to network or system problems and working with customers to develop or upgrade software; and Bagwell v.

---

[7] ECF No. 26 Ex. B.

Florida Broadband, LLC, 385 F. Supp. 2d 1316, 1319-20 (S.D. Fla. 2005), in which a Network Operation Engineer specified protocols for use in the network of this employer, maintained network availability and security, interacted and consulted with clients and created solutions for issues that arose.

However, Plaintiff notes that in Bagwell, the employees suggested hiring, pay raises, equipment purchases and ways to improve and correct the network, but he did none of these tasks. Similarly, Plaintiff's description of his day-to-day duties differs significantly from that of the plaintiff in Heffelfinger. Plaintiff also cites an Opinion Letter from the Department of Labor's Wage and Hour Division, in which copy editors' duties were described as:

> Read[ing] and mak[ing] any necessary corrections to club marketing promotional materials for structure, grammar, comprehension, spelling, clarity, and accuracy. They correct the keying of test versions and check for adherence to legal requirements for trademarks and copyrights and postal and scanning standards. They also review the accuracy of publication titles, authors' names, code numbers, and prices and ensure that the company's requirements for style and procedures are met. All of these processes appear to be technical steps involved in the production of the employer's marketing materials.

Wage and Hour Opinion Letter FLSA2006-45, 2006 WL 3930478 (Dec. 21, 2006). The opinion concluded that copy editors did not satisfy the requirements of the administrative exemption.

Defendant argues that Plaintiff's position cannot be described as "directly related to production," but "the administration/production dichotomy is useful only to the extent that it helps clarify the phrase 'work directly related to the management policies or general business operations.'" Bothell, 299 F.3d at 1126 (citation omitted). Genuine issues of material fact preclude Defendant from demonstrating that Plaintiff's job activities met the second part of the test.

The parties also debate whether Plaintiff's work was of "substantial importance to the management or operation of the employer's business," citing Martin v. Cooper Electric Supply Co., 940 F.2d 896 (3d Cir. 1991), and an outdated regulation, 29 C.F.R. § 541.205(a) (1983). As the Court of Appeals has explained, changes in the Secretary's regulations since Cooper have rendered that portion of the opinion no longer valid. Smith, 593 F.3d at 286.[8] Because this regulation is no longer in effect, the Court need not address this issue further.

Discretion and Independent Judgment Test

The third part of the test requires that the employee exercise discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.202(a). This factor "implies that the employee has authority to make an independent choice, free from immediate direction or supervision … [but can be met] even if the[] decisions or recommendations are reviewed at a higher level." 29 C.F.R. § 541.202(c). The determination of whether an employee exercises discretion or independent judgment must take into account "all the facts involved in the particular employment situation in which the question arises." 29 C.F.R. § 541.202(b). The regulation further provides that:

> Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the

---

[8]     The district court opinion explained that the modern version of the regulation, 29 C.F.R. § 541.201(a), updated on April 24, 2004, dropped the "substantial importance" requirement. Smith v. Johnson & Johnson, 2008 WL 5427802, at *8 (D.N.J. Dec. 30, 2008).

employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

Id.

"The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(e). The regulation also states that "[a]n employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly." 29 C.F.R. § 541.202(f).

As the facts outlined above indicate, there is a genuine issue of material fact in this case as to whether Plaintiff exercised discretion and independent judgment as an FXR Specialist. BNY Mellon portrays the position of FXR Specialist as involving: consulting with internal and external customers and making judgments about what methods and deadlines should be established to transfer files in the light of the time, confidentiality and technology constraints on the interaction; formulating creative and specialized transfer plans (at least some of the time); using knowledge and experience to address and solve problems that arise during the transfer process; seeking help from supervisors, co-workers or other BNY Mellon business units as necessary; answering client questions about the file-transfer process in general, the specific plan developed for the at-issue transfer and any issues or concerns from the client's ends; setting time

tables for and managing multiple projects concurrently regarding software evaluation and recommendations, program enhancements and testing; and doing all of these tasks with only general supervision.

However, Plaintiff paints an entirely different picture. He contends that FXR Specialists: do not have the discretion to deviate from the protocols utilized in the transmissions; use protocols provided by an outside vendor which essentially have a punch list or a checklist of things that need to be done or to be determined to make the protocol work; are not required to have a degree in computer science, a college degree or any particular licenses to perform their jobs; cannot tell a client that a protocol will not support the client's needs or that a protocol will be provided at another time; do not need to have 2 to 4 years' experience with the Company's organization technology, practices, standards and procedures or have a solid or any other understanding of the Company's overall software architecture and infrastructure components and are sometimes hired off the street and trained to perform the job; are not required to be "creative" but have to follow existing procedures and cannot deviate from them; do not have any involvement in the plan development stage of the file-transfer process; "decide" which protocols are appropriate merely by sending a list of them to the client and asking which ones are compatible with the client's systems; do not negotiate regarding the use of protocols; and are told each morning by Thomas Hartos what projects to work on and how to prioritize their work and are micromanaged by Hartos with respect to essentially every aspect of their work.

Defendant cites <u>Paul v. UPMC Health System</u>, 2009 WL 699943 (W.D. Pa. Mar. 10, 2009), in support of its position. In that case, the plaintiff, Susan Paul, was a financial analyst with Beaver Valley Mental Health Services ("BVMHS") who argued that all she did was enter

data into a standard computer program.  However:

> Defendant explains that plaintiff's duties, which included preparing budgets and other fiscal information, working with department managers, interacting with county agencies, and overseeing the billing and auditing of [BVMHS's] contracts, all were performed without any lateral oversight and minimal involvement of superiors. Defendant points to specific incidents as examples of the exercise of discretion and independent authority. [Her supervisor] attempted to shift the portion of a salary of a WPIC employee to a county agency, pursuant to one of the contracts with that agency. Plaintiff insisted that such a shift was not permitted under the contract and instructed the billing clerk to not include the suggested "cut" in the proposed budget. [The supervisor] attempted to use funds that had not been spent on a particular contract in order to purchase equipment. Plaintiff refused to allow the expenditure, since the contract did not permit the use of the funds for that purpose.

Id. at *11.  Paul did not contest these assertions, but argued only that, because her supervisor specifically prohibited her from contacting certain individuals and from temporarily asking questions via email to other people within the organization, she did not have as much authority as the employer contended.  Judge Conti rejected this argument and concluded that:

> Plaintiff's position may have largely involved the entry of data, but she nevertheless had to exercise her own judgment in accomplishing that task. In overseeing the billing of contracts, plaintiff had to prepare budgets. WPIC would ask plaintiff to propose "cuts" in the budgets to save money; plaintiff had the discretion to determine which cuts to propose, and plaintiff sent those budgets to the Oakland office for review. Plaintiff does not dispute that she had the discretion to approve or disapprove purchases and expenditures within contractual and budgetary guidelines, even when WPIC and her direct supervisor suggested otherwise. Such responsibility demonstrates that the duties of plaintiff's position affected a segment of defendant's business operations to a substantial degree, and that she investigated and resolved matters of significance on behalf of her manager…. Such responsibility also demonstrates that plaintiff's position exercised authority to commit the employer in matters that have significant financial impact. Her decisions not being final and having to be reviewed by superiors or others in the Oakland office do not render her without discretion or independent judgment.

Id. at *12.

In this case, by contrast, Plaintiff has taken issue with Defendant's assertions about how much autonomy he had and how much discretion Thomas Hartos permitted FXR Specialists to exercise. Nor does Defendant contend that Plaintiff had the responsibility to approve or disapprove purchases and expenditures within contractual and budgetary guidelines even when Hartos suggested otherwise, as Paul did.

Defendant also argues that employees in the information technology sector who research, identify solutions for and resolve technology problems typically are found to exercise discretion and independent judgment, citing several cases. However, Plaintiff notes that, in Bagwell, the employees suggested hiring, pay raises, equipment purchases and ways to improve and correct the network, but he did none of these things. He further observes that, in Koppinger v. American Interiors, Inc., 295 F. Supp. 2d 797, 799-806 (N.D. Ohio 2003), an information technology director upgraded and administered the computer system, investigated problems, considered possible solutions and was accountable for the network to be running properly, but Plaintiff did none of these things; and that in Horne v. Singer Business Machine, Inc., 413 F. Supp. 52 (W.D. Tenn. 1976), the plaintiff was a systems analyst who modified programs, devised computer systems for customers and assisted in policy making, while he did none of these things. Finally, he observes that, in Renfro v. Indiana Michigan Power Co., 370 F.3d 512, 519 (6th Cir. 2004), "planners" at a power company independently determined the nature of repair tasks and generated repair plans using their own skill, judgment, experience and discretion, but he worked with four protocols which dictated the system BNY Mellon had for transfers and he merely contacted customers to find out their system and which protocol was compatible with it.

Defendant argues that, to the extent Plaintiff cites Hartos's deposition (ECF No. 25 Ex.

2), he has taken statements out of context.  It further contends that Plaintiff's statements conflict with comments he made in various self-appraisals, comments about the position made by his supervisor in performance reviews and comments made by his co-workers in questionnaires they submitted (King Decl. ¶ 3 & Exs. 1A-1G).  The Court need not reach these questions, however, because Plaintiff's affidavit alone is sufficient to demonstrate the existence of genuine issues of material fact as to whether he exercised discretion and independent judgment in his job.  As noted above, Plaintiff can testify from his own personal knowledge as to the work he performed and the work environment in which he operated.  At trial, Defendant may be able to challenge Plaintiff's credibility with these other pieces of evidence, but at this stage of the proceedings, they demonstrate only that key facts in this case are disputed and must be resolved by the trier of fact.

For these reasons, it is recommended that the motion the motion for summary judgment submitted on behalf of Defendant, The Bank of New York Mellon Corporation (Docket No. 12), be denied.

Within the time specified in the Notice of Electronic Filing, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,


s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

Dated:  January 20, 2011